Anybody have a chance to get settled before we do anything? We've got several counsel here. Case number 14-2506, 14-2507, and 15-1724. 15-1724, United States of America v. Carlos Powell et al. Oral argument not to exceed 15 minutes for each defendant, 30 minutes for plaintiff. Mr. Loren for the defendant appellate. Thank you. Judge Boggs, Judge Moore, Judge Guy, D.J. Loren for Carlos Powell. I'd like to start by talking about the Fureta issue, which is unique, of course, to Mr. Powell. I have just one question, procedurally. You announced 15 minutes, I think it's 10 minutes. That's what my timer is reading anyway. The right of self-representation is an odd one in that it usually means the right to shoot oneself in the foot. But it is a right, and it is not a privilege. And there is no basis in this record for any conclusion, the trial court's conclusion, that Mr. Powell was asserting that right, quote, merely to delay the trial, or the government's alternative explanation, which Judge Murphy didn't pass upon, that Mr. Powell, in asserting his right to self-representation, was seeking to disrupt the proceedings. Now, could he have sought on the morning of trial to self-represent? There would certainly have been a bigger question about that, because that could have conceivably interfered with the orderly progress of the trial, but that's not what happened. He asserted his right of self-representation more than a month previously. The government in the district court conceded that it was timely, and ultimately in deciding the government's motion for reconsideration, Judge Murphy assumed without deciding that the assertion was timely. The key thing here, however, Judge, to me, is that in beginning the Feretta inquiry, Judge Murphy predicated the proceedings by a very specific statement that, in light of all of the delays that had occurred and all of the defendants who were at issue, et cetera, there would be no continuances. He said with that in mind, Mr. Powell, do you still wish to represent, is it still your choice to represent yourself? Was there a specific amount of continuance discussed? There was no continuance. No, I know, but when you said that I won't give you a continuance, he just meant zip, zero. Nobody said I want an extra week. No, and what Judge Murphy said, there had been continuances in the past, not that there would be a continuance. And did your client ask for a continuance in order to prepare himself? He did not. So far as we know from the record, your client could have gone ahead representing himself at the trial three weeks or four weeks later. That's all the record reflects. As I say, Judge Murphy predicated the inquiry by saying, knowing that there will be, I just explained to you, there are not going to be any continuances. Do you still choose to represent yourself? Mr. Powell said unequivocally, yes, sir, that is my choice. You know, the colloquy that is mandated by Ferretta seems to me ought to be the central focus of the inquiry because that's really what Ferretta was about, was the sufficiency and appropriateness of the assertion of this right of self-representation. The government kind of wants us to ignore the colloquy and wants to focus on other things, like Mr. Powell's filing of the Moorish science documents and even his desire to file pro se motions, and at least there's this Holder versus Tibbles where we give that as an example of something where self-representation isn't allowed. If you're really not distressed with your counsel, you just want to do your own thing as well. Isn't that what Holder says? I suppose so. I must say I'm vocational. I was swimming around in my head. But the central thing is here that Mr. Powell and Judge Murthy went through the bench book inquiry that is required. Mr. Powell answered appropriately, explained that he would be bound, agreed that he would be bound by the rules of evidence and the rules of procedure, and the central teaching of a central teaching of Ferretta, it seems to me, and this applies both to the fact that Mr. Powell acknowledged that he had no legal education, was not familiar with the rules, although he agreed he would be bound by them, and also the fact that he had been attempting to assert these sort of eccentric legal theories, but the central teaching of Ferretta is, and I'm quoting, his technical legal knowledge as such was not relevant to an assessment of his knowing exercise of the right to defend himself. And whatever else Mr. Powell wanted to do by way of pleadings, there was no suggestion that those pleadings would have been disruptive, those pleadings would have required delay, or that Mr. Powell wasn't conducting himself in an orderly, respectful, and entirely appropriate way. So if you're right on all of this, what's the remedy? A new trial where he can represent himself? I think so, Jennifer. That's also an odd kind of remedy, but that's what, I think that's what, and I, that's what he gets, yes. And he would have to represent himself at such a new trial? I haven't done, I haven't examined the case at all with great, I mean because the question I was going to ask was, you've made the case, and I don't know that it's really been controverted, that as a technical matter the Ferretta colloquy went through and he gave the right answers, but both Halder and others say you can also have a request not made in good faith, even if those tick boxes are ticked, is that correct? Yes, sir, but there, I don't see. And that was really what the district judge said. But there's no basis for that finding, other than that Mr. Powell entertained some oddball legal theories. Well, the James case from the Seventh Circuit, actually it's kind of the procedural inverse of this case, where a defendant was allowed to represent himself and on appeal, argued that he shouldn't have been because he was a more science guy. The Seventh Circuit said, well, the fact that you have bizarre legal theories doesn't mean you can't exercise a right of self-representation. If it were so confined, so many of the tax protester cases and other cases would come out a different way. But the answer to your question, logically it seems to me, I haven't examined the case law because I haven't examined the case law, but it would seem to me that if the wrong is that he was denied the right of self-representation, the remedy would be that he would be given it. But it is an interesting conundrum if he then at the second trial said, oh, well, now I think I would like to have counsel. And so we would have the potential for people really gaming the system under that scenario. So I'm curious whether that's ever happened, because obviously there have been cases where people have been granted new trials under FRED, I assume. Again, I don't want to make a concession because I haven't done the research, but I could certainly see Judge Murphy saying or this court saying that if he doesn't exercise his right of self-representation, he doesn't get a new trial. In that vein, though, at the point in the trial when he was saying that he didn't understand criminal proceedings and so forth, if I remember correctly, he did ask for standby counsel, though, if he was to represent himself. It was not a specific request. He said, will I be able to have standby counsel? And Judge Murphy replied, well, maybe yes, maybe no. Really, I don't have to give you that because you would be on your own. And Mr. Powell said, I'll be on my own and accepted that. Obviously, if this case does go back, I don't think there's a right to standby counsel. I think the trial court would be well advised to supply standby counsel just to make sure that everybody's interests are best protected. But that, I think, is a discretionary call. I'd note that the government, in its motion for reconsideration in the trial court, specifically recommended or asked that Mr. Powell be granted standby counsel. I think that would be a wise thing. I'm not sure it's a mandatory thing. Anything else, anyone? Thank you. Thank you very much. Good morning. For the record, my name is Dominic Cerise. I'm appearing on behalf of Eric Powell. In our brief, we raise two issues. They're limited to pretrial motions and objections to the admission of evidence. One of those, on appeal here, we break that up into two issues. One regarding cell phone identification and location data. And the second one, poll camera evidence, so to speak. I want to focus on the first issue. And I'd like to focus on a couple of matters with respect to the first issue. And those are the judge's finding of good faith and also his finding with respect to the first issue of attenuation. With respect to the applications and warrants for cell site location data and GPS, the judge found that the government did not make the appropriate specific showing that was required. However, from there, the judge found that there was good faith and allowed the evidence in. In doing so, we maintain that he didn't give a complete ruling based on the objections on the record and that the ruling he gave or the issues he missed made his ruling erroneous. Initially, these applications and warrants allowed for the seizure of anything leading to evidence as opposed to evidence. And it is the argument in the brief that the edge of the Fourth Amendment, the scope of the Fourth Amendment, is limited to evidence, not information or items leading to evidence. So therefore, we maintain that on its face, the warrant is facially defective and overbroad. And that issue- What is your best case to support your position? There are a number of them cited in there, but I believe it is the one publishing case, I think Stanford Press, which indicates it is not all documents that are available and that was the execution of a search warrant regarding a publishing company or a business, but that only the documents that were evidence of a crime, not leading up to other records were to sit there. With respect, was there a Leon issue there in terms of, is that apparent from the face of the warrant to an ordinary policeman as opposed to a better magistrate? Judge- At least most of the things, the ones I've seen that are ruled as deficient on their face are rather more stark than that. That's the reason I asked. There is the edge there. It's evidence of a crime, contraband or evidence of a crime. And it goes definitely beyond that. And since we're dealing with a case with overwhelming electronic surveillance, the police in this matter certainly took advantage of that scope. The case you called Stanford Press, is that Stanford Daily? Yes. That's the student Vietnam War case? Yes. And Judge, the second question raised with respect to this in the sequence of evidentiary hearings here is that there was no addressing of what were the frank issues in this case. That from the first warrant, which the judge addressed, found, approved it because of good faith and then went on and approved all the rest, that it omitted material information that was included in the second and subsequent warrants or applications for cell site information and GPS. And that is, in a brief, we maintain the judge's opinion doesn't address that at all. And lastly, you say the material information was kind of, correct me if I'm misstating it, you might say counter arguments. We need to do this for this reason. And then someone could say, well, you don't really need to do it because there's something else. Well, they included it in there. When they wanted certain information, they excluded a paragraph or made certain representations or avoided the representations in this case. And then later it was generic. It's not like they left out that Mary Smith said something or they left out that John Jones told us your guy is innocent. I guess it could be viewed that way, but it's definitely they left out matters that would have undercut the showing that they were made, which the judge found was not sufficient on the first application. All right? And lastly, Judge, we make an argument that the use of a cell phone simulator that was used a number of times in this case, and it was critical to links of all other electronic evidence that were used in this particular case, is that that was had in violation, wasn't authorized by the Penn Register Trap Trace Statute, and actually foreclosed by the Communication Assistance for Law Enforcement Statute. Now, while statutes don't allow for exclusion of that evidence, we have the government using statutes but not staying within the terms of a statute. And I think there's case law out there generally saying if you're going to use a statute, you've got to stay within its terms. If you don't stay within its terms, it doesn't amount to good faith. Give me the argument on the Penn Register versus the simulator, because obviously the simulator is something new, but a Penn Register tells you when the phone's being used, who's calling in, who's calling out, length of time. Well, I can tell you what the difference is in how they used it in this case. I'm talking about the information, because the simulator, the information goes out, isn't it pretty much the same thing, is who I am, who I'm calling, who's calling me. Yes, but the way it's accomplished is a lot different, Judge. Why does that make a difference? Because it is not within the statute. They relied on this statute to obtain this information. What does the statute say that is violated here? It doesn't authorize the information that they're looking to obtain the number. Generally, when you get a penalty... A device or process which records or decodes dialing, routing, addressing, or signaling information. Correct. Isn't that what it decodes, the electrons that are going out of your guy's machine in his hand? That assumes you have the number already. It decodes the numbers you're calling and the numbers that are calling you. Right, but it doesn't... Okay, but you need that number to start with. And this is like... But it doesn't say from which you already have a number. Maybe it should, but nevertheless, it seems to be about getting hold of electronic signals that convey certain information. But these are not signals that are voluntarily placed in a phone, which a pen register and a trap trace aims at. I'm sorry, I mean, in a pen register, you voluntarily use the phone, right? That's right. So if you have the phone, you're asleep at night, the simulator obtains the information from that in your home, from your own bedroom. If somebody calls you in the middle of the night, I'm sorry. Pardon me? If somebody calls you in the middle of the night, the same thing happens. You didn't do anything, but the pen register is going to pick it up, right? That's true, but here is the government doing it for their purposes, which is not piggybacking on what is voluntary or consented to. No, and I was thinking that you have your phone on. If you didn't have your phone on, it wouldn't be happening, but you voluntarily have your phone on. I believe the simulator may not even work if you are talking on your phone. You can't get the number from it. That's what a simulator does. It obtains the phone number so that you can get a pen register. Isn't Judge Moore right that if the phone is simply off, no power? Yes, I believe so. It doesn't work. Thank you. Go ahead, Judge Guy. On the issue of location information, the district court found that there was no evidence that the DEA had, in fact, used that information for location information, and I don't see where that factual finding is disputed anywhere on appeal. I don't know if I exactly understand your question, Judge. He's saying that the government did not use this information, even if there was anything wrong with their getting it. Well, Judge, when you have an investigation that is driven by several forms of electronic surveillance, it's like an intertwined and is the heart of the whole investigation. It's pretty hard to parse out particular facts in the derivative because this is what they used to drive the investigation in the case. So I can't point the court to a specific instance, but they used this throughout this investigation, and this is how they got the results that they did get. Okay, thank you. Anything else, Judge Guy? No. I think he's agreeing with you. Good morning, Your Honors, and may it please the court. Kevin Carlson appearing on behalf of Appellant Ernest Probe. From my original ten minutes, I've reserved two minutes of time for rebuttal. You may. Your Honor, this case, although it arises out of the same trial as that of the Powell brothers, Mr. Probe's appeal, in fact, raises a distinct issue of fundamental right and a distinct set of facts that were unique to the relationship between him and his originally retained counsel. The law is very clear that when a defendant is able to retain an attorney, the choice of counsel to assist him rests ultimately in his hands and not in the hands of the state. In this case, this court should reverse Mr. Probe's conviction because the district court deprived him of a fair opportunity to secure his retained counsel of choice in violation of the Sixth Amendment. There is no dispute between the parties that the right to secure counsel of choice is fundamental, that it is grounded in the text of the Sixth Amendment itself, and that according to the Supreme Court, it is the root meaning of the Sixth Amendment guarantee. But there have to be some limits. For example, hypothetically, if he had asked to retain different counsel on the day of trial, would he have a right to do that constitutionally if the district court found that there were some problems with it? The case on point is Wilson v. Mintz cited in our briefs, a 1985 decision of this court. Although there are limits, Judge Moore and we agree that the right to retain counsel of choice is neither absolute nor completely unrestrained under the right circumstances such as those presented in Wilson and we believe here. If there is a complete breakdown in the relationship between the attorney and the client such that the fairness and the integrity of the proceedings is called into question, not only at that late time should the defendant be able to retain new counsel, they also may have a Sixth Amendment right or a due process right to a continuance for that purpose. Did your client ask for a continuance? He did not. And that is a difference of opinion between the appellant and the government in this appeal. The government in its brief says, they go so far as to say that Mr. Probe demanded a continuance. And that in fact is not true. The operative section of the record, Your Honor, is page 9155 of this trial court record, which is record number 587. It is the transcript of the motion hearing that was conducted in the district court on April 16th of 2014. This goes to our issue that the trial court abused its discretion in part by failing to conduct an adequate inquiry of the facts and circumstances leading to the breakdown in the relationship between Mr. Probe and his counsel. And the reason for that is as follows, and I'll read directly. That hearing is roughly two weeks before trial, is that right? That hearing is roughly 13 days before trial, that's correct, Judge Box. The issue was raised, however, 35 days before trial on March 26th. And our position, to be clear and straightforward with the court as we can possibly be, under Benitez v. United States, a 2009 decision of this court, when the issue arose on March 26th, 2014, that there was a breakdown between Probe and his retained lawyers and that Probe wished to retain counsel. Our position is that Benitez and Gonzalez-Lopez and Wheat required that the district court engage in the meaningful inquiry into the facts and circumstances at that time. So that if, in fact, there was a need for Mr. Probe or grounds for Mr. Probe to find alternate counsel, given the fact that time could be of the essence, that he'd have as much time to do so as possible. The district court, in this case, delayed the decision or ruling on the motion not only from March 26th until April 26th, further cramping the time between the inquiry and the trial, but then also delayed its decision after April 16th until, I believe, April the 21st or 23rd, which at that time was less than a week before trial. What was the DJ's reason for doing that? Oh, his reason, Your Honor, as stated on the record on March 26th, was that we, quote, still had a little football left before the trial. And so I'll let you make a record through briefs. Well, at that point, I mean, one could certainly argue it, but there seems to be some back and forth. A motion, a formal motion, was filed to withdraw about a week later. It's April 3, so now he has the motion. He schedules a hearing, holds a hearing on April 16th, roughly that right. That's right. That seems to be the triggering event for the scheduling of a hearing and for the district court's initiation of a process to decide the issue. And, in fact, he grants one counsel the right to withdraw but not the other. That's right. And that other counsel then actually does the trial. That's right. And there's no second chair? There was no second chair. And that counsel who did the trial then was the one who said that she had not prepared for trial. She stated that she had not prepared for trial, had not prepared for cross-examination, had not met with the client, had not undertaken anything. Not ever met with the client? Well, had not adequately met with the client for the purpose of preparing for trial. Because my record, my recollection of what I've read, please correct me if I'm wrong, was that these two counsel were supposedly assisting in the pretrial matters but not supposedly preparing for trial. That's what they stated to the district court. It's important, I think, to recognize under Benitez, the obligation of the district court constitutionally to make an inquiry that would satisfy the Sixth Amendment was triggered on March 26th, even if the formal motion to withdraw was not filed until April 3rd. And the reason for that is the court at least had good reason to understand that there was a breakdown here and that trouble was looming between these attorneys and their client. This process was initiated by the attorneys going on the record at the final pretrial conference on March 26th and saying to the court, Your Honor, obviously we have not prepared. And the reason we have not prepared is because our retainer with Mr. Probe was for a limited scope of representation only. He only retained us to do pretrial work and he only retained us to try to negotiate a plea deal. They had been involved in this for, I mean, he was indicted what, two years earlier roughly? I believe just under two years prior. Something like that. So we have a situation in which a person who has the means to retain counsel retains counsel and gets to within a month of this massive trial and says, Oh, you know, I didn't hire them to defend me. No, he says, I did hire them to defend me. They say he did not. And the cases about the right to counsel of choice are very clear. The reason why the right is given a presumption, and the district court did not obey that presumption in this case, it's ruling on the record denying the motion to withdraw says nothing about the constitutional presumption in favor of Mr. Probe's right to counsel of choice. It says nothing about it. Now, there wouldn't have been anything, he didn't say, Oh, I've got another counsel I've hired that I want instead of Ms. Macaroni, right? That's right, Your Honor. But, again, Wilson v. Mince's 761F2 at 279 in Note 4, quoting U.S. v. Johnson, a Sixth Circuit case from 1963, says that the Sixth Amendment does not concern itself with who the person might be. And Benitez is very clear. Benitez didn't know who his replacement attorney might be either. And Benitez demonstrated nothing but confusion when the district court tried to probe into what had happened between him and his attorney that caused the breakdown, literally the night before the sentencing. But, again, trying to do a hypothetical that might be helpful to understanding, what if a client wants to delay trial and decides that he's not going to cooperate and then a month before the trial says, Well, my lawyers are not talking to me and are not doing what I want them to do, and so I want to hire another lawyer. Can he do that? Do those two cases that you've been relying on say he can do that and delay the trial, you know, another five months in order to get them up to speed? The word that I would highlight is showing. If there is an adequate showing, and showing is the word taken from me. Showing of what? A showing, a factual showing that that was the intent behind the behavior of the defendant in asking for a change of status of counsel or asking for a continuance, which, again, didn't happen here. If there is a showing of those facts, then arguably that would be sufficient to overcome the presumption in favor of the right to counsel choice. But that kind of showing wasn't fleshed out here, either by the inquiry on the record of March 16th or April 16th, or in the recitation of the facts in the district court's order denying Okay, so basically the judge's statement that I think he's just trying to interfere with the administration of justice, I've seen nothing wrong with the representation by counsel to have my highest respect and regard. That's just clearly erroneous. It's clearly erroneous. It represents a misapprehension of the Gonzales-Lopez standard, which doesn't require a showing of prejudice. Mr. Progue has the benefit of a presumption in favor of the right to counsel. He does not bear the burden of coming out of the gate with that kind of showing. The district court just simply didn't have the facts to support that conclusion. One of the grounds that counsel used for wanting to withdraw was that they wouldn't be paid. Of course, the court solved that problem by appointing them under the Act, or the one attorney under the Act. The one didn't qualify. Isn't that correct? That's correct. She wasn't even on the roster for appointed counsel within the district, Judge Guy. The attorney who was appointed strenuously objected because she said that the proceedings leading up to that point, including the disclosure by counsel that they had not prepared for trial, had irreparably undermined the trust and confidence that Progue had in his lawyers at trial. If there ever was a case where being forced to go to trial with a particular attorney would undermine our faith in the fairness and integrity of the proceeding in and of itself, it's one where the attorney is going on the record, and this is Attorney Masseroni, humbly saying to the court, if you make me do this, the fairness and the integrity of these proceedings will be in doubt. Now, let me ask you this question related. We're spending our time on this issue, but there's other issues raised. If I'm not mistaken, he raises sufficiency of the evidence, doesn't he? He does, Your Honor. And if we were to, if he wins on this counsel issue, the result is a new trial? Correct, Your Honor. If he wins on the sufficiency of evidence issue, that ends it, doesn't it? It could, yes, Your Honor, it could. Well, is that something we should go ahead and decide in this case? That being whether there was sufficient evidence, yes, we believe the court should decide that issue. Okay. And what's the effect of that in a retrial, if any? Well, the effect of it would be the government would start from scratch. Now, if there's insufficient evidence, isn't it barred in retrials? Well, a retrial would be barred. That's right, that's right. I'm sorry, I'm confusing the, if it were remanded for him to have new counsel, the government would start from scratch. I understand that, but my question was if we find, if we have to address the issue, we could also find that there was sufficient evidence. Yes. My question was what's the effect of that, if any, on a new trial? It would be a dismissal and the case would go away. No, no, not if we found there was sufficient evidence. Oh, oh, if they found, oh, I see. If we reach the question, the answer will either be there was or there wasn't. I apologize, Your Honor. I took the long way to get to the answer. Under Gonzales-Lopez, the 2006 decision of the Supreme Court, there is no harmless error review and there is no showing of prejudice required in order to establish a structural violation of the Sixth Amendment. And if the case were to be remanded, even if the evidence were sufficient or overwhelming in the first trial, the Sixth Amendment guarantee is personal to the defendant and it guarantees him a trial with his counsel of choice regardless of the adequacy or the strength of the proofs of trial. Thank you. It would be a new trial with counsel of choice. That's correct. Possibly or not possibly joined with the other gentleman arguing by himself. Is there more? No, that's fine. Thank you, Counsel. Thank you. You have three minutes or two minutes for rebuttal. May it please the Court. Andrew Getz for the United States. I'll start with the suppression issues first and then move to the self-representation. Can you speak up a bit? I'm sorry. You're tall. I will start with the suppression issues first and then move on to the Sixth Amendment claims, if that's all right with the Court. On the location warrants, the location warrants here contain probable cause that tracking the defendant's location would reveal evidence of their ongoing drug conspiracy. Those warrants, therefore, satisfied the Fourth Amendment or at the very least the good faith doctrine. The defense counsel raises two arguments against that here, neither of which should carry the day. The first is the claim that because the warrants said lead to evidence rather than evidence itself that they were somehow not just invalid but so presumptively invalid that no officer could rely on him. That argument fails for three reasons. First, if this Court looks at the Fourth Circuit's decision in Gibbs, it actually used a standard similar to what the warrants stated here. It said, reveal information about the nature and extent of the drug organization. So it actually parallels what these warrants said quite close. The authority's second brief did not address this question. I'm not aware of any court that has addressed this question. It would be odd to hold that one, given that there's no court that has addressed this question, that the officers could not rely in good faith on these warrants. You say there's no case that's addressed this question. You mean the question whether you can have enough in a warrant when you just say leads to evidence? Is that the question or is there some other question? That's the question I'm referring to. Whether saying leads to evidence is enough. So there's no case that said that isn't enough and is there a case that says that is enough or just people haven't even talked about it ever? There's very little authority on it. I think Gibbs is the closest case. It's one of the few court of appeals decisions to address this issue, and it didn't confront this issue head-on, but the standard it used was reveal information about the nature and extent of the organization. That's the language the court used. The final point I'll make, Your Honor, is it's not. And so did it hold that that was within the Fourth Amendment definition of evidence? I'm sorry, Judge Boggs, I'm speaking of something different. That wasn't the language in the warrant. That's the standard the court adopted for what probable cause had to show. Okay, go ahead. Now the final point I'll make is saying what you're looking for is leads to evidence versus evidence is really a distinction without a difference. Anything that leads to evidence is itself evidence in some respect. It may be circumstantial evidence. It may be weak evidence. It may be inadmissible evidence. But it is evidence of that crime, whether it's itself admissible or whether it leads to something that is admissible. So, for example, knowing the murder weapons in a safe deposit box, knowing where the safe deposit box is itself evidence. That's correct, Your Honor. Even though in its face it isn't, that isn't. Right. I mean, let's say... It would lead to evidence because you have to get the box, see if the murder weapon is in there. Right. And so if you were interviewing a witness, for instance, and the witness told you the murder weapon is in the box, well, that wouldn't be admissible evidence, that hearsay. That would be a Confrontation Clause violation. But it would still be evidence that would also lead to evidence. So it's really a distinction without a difference that they're attempting to draw here. For some reason this is reminding me about civil discovery issues and limitations on civil discovery and whether you can seek information about things that lead to evidence as opposed to just evidence. And that's somewhat of a controversial area. I don't know what the analog is in the criminal law area. But your backup is that there's good faith here anyway. If it's so vague that we don't know what we're talking about, then the officer should be given the benefit of the doubt under good faith. That's correct, Your Honor. Where there's no authority prohibiting it especially, because it is an undecided and at the very least a close question, probably one that does lean in favor of the government, if the court reads the decision in Gibbs, the officers could rely on that warrant in good faith. Their second argument. Judge Guy, when the whole affidavit is read though in context, it is clear that the only reference of evidence has to be evidence of the drug dealing. That's what the whole affidavit is about. So I'm not sure that you even have to say it's evidence that leads to evidence. They're actually saying that in effect the way I read it, there would be evidence of drug dealing. That's correct, Your Honor. It does show probable cause of evidence of drug dealing. Tracking their location is going to show stash houses. It's going to show co-conspirators. It's going to show cars they use. That in itself is evidence that would also lead to evidence. Now moving to the Franks issue, they don't actually make a Franks claim here. They don't state anything that would make any of these affidavits materially misleading. That's the standard for a Franks submission. It's not enough to just say the officers could or should have included more. You have to point to something in the affidavit that became materially misleading because they didn't include something. That's a Franks submission. It's a tough standard to meet, and they haven't pointed to anything on that front here. I'm happy to answer any further questions on the location warrants. Otherwise, I'll move to the cell site simulator. In the reply brief, the defendants have abandoned any Fourth Amendment claim that the cell site simulator, at least as used here, constituted a search under the Fourth Amendment. Their argument, therefore, fails for two reasons. One is that the use of the cell site simulator here did fall within the pen register statute, and second is that a violation of the statute standing alone is never enough for suppression. There has to be a concurrent Fourth Amendment violation. When you say the reply briefs abandon this, are they explicitly abandoning, or are they simply not arguing it? Explicitly abandoning, Your Honor. If you look at Eric Powell's brief at page 1 and Carlos Powell's brief at page 18, they say their argument is not that a Fourth Amendment violation occurred, except insofar as location data was acquired. That's not quite verbatim, but it's close. And as the district court found, and that's at page 1277, I believe there was a question on that earlier, page 1277 of the record, there was no location data acquired here. It was just used to determine the defendant's phone numbers. So that in itself resolves the Fourth Amendment claim, is their abandonment in the reply briefs. It also, the defendants in their briefs do not really specify how or why these cell site simulators would not fall within the definition of a pen register. And if the court looks at the definition of a pen register in section 31273 of the statute, it refers to a device or process, that's the cell site simulator, which records or decodes dialing, routing, addressing, or signaling information, that's how it functions, transmitted by, and then there's the definition of a cell phone after that. So it fits squarely within the definition of a pen register. Now it's not what a court would traditionally view as a pen register. That's actually by design. If the court looks at the 2001 amendments and legislative history behind them, the statute was amended in 2001 precisely to encompass the expansion of cellular technology to make a pen register account for advances in technology. So this is the purpose of the statute. It would be odd to interpret a statute that was expanded for this reason and similar reasons not to include this type of information. It was amended generically. That is, I don't think they knew about the Stingray technology at that point, did they? I don't know if they knew or not. I think there was some nascent technology working its way through in the 90s. But even assuming they didn't, they worded the statute broadly to account for unforeseen circumstances. Basically, there's all these electrons in the atmosphere, and if we can get hold of them, that's fine as long as we don't get the contents. That's correct, Your Honor. The legislative history and the statute itself makes a very precise and direct distinction between content and routing information or single information. Of course, had the government obtained content using it here, we would not have this argument. It would be a wiretap. It would be a violation of tax, and we would not have an argument to stand on. I'll move next, unless Judge Guy, do you have any questions? I'm sorry. No, thank you. I'll move next to Carlos Powell's self-representation here. Self-representation. The district court here did not abuse its discretion in finding that Carlos Powell's continued insistence on filing his protester documents, even after the district court told him not to, even after two district judges struck those documents, and even in his answers during the Feretta hearing, combined with the suspicious timing of his request, demonstrated an intent to obstruct the trial proceedings rather than a genuine desire to represent himself at trial. And I'll start with the protester filings, because there's a misconception in Mr. Loren's argument about what those are and why they're relevant here. Protester filings, standing alone, would not be a basis to deny somebody the right to self-representation. That much is clear. They don't come up often, but they come up frequently enough, and if that were all this was, that would not be a basis to deny self-representation. The problem we have here is that the defendant refused to stop when ordered to. The last time he was pro se, before it was the pretrial docket, he filed all of these protester filings, and a judge actually struck them. That order striking those filings didn't stop him from filing them again as trial approached, and he decided he wanted to represent himself to advance these arguments. The judge struck those in a written order, and that's on page 1838. Then at the final pretrial conference, actually instructed the defendants not to file those and warned them against filing anymore. That's at page 4186. So when the judge reached the Beretta hearing a few days after that, the first thing out of the defendant's mouth is that he wants to file these documents, despite being told repeatedly not to. The district court could fairly conclude from that, that he had seen a preview of what the defendant would do during the trial proceedings, immediately before and during trial, that if he instructed the defendant to stop filing these, to stop making these arguments, whether before trial during hearings, or whether during trial in front of the jury, when it really mattered and could risk a mistrial, that Mr. Powell would not stop. That's the key distinction here. Was that the basis for the district judge's ruling? Not specifically, Your Honor. The district judge said delay trial. Now Mr. Loretta interprets that to mean only delay the start of trial. That's not what the district court said. The district court said delay trial. Delay can mean not just the start, but delays within the trial. Aren't there two different scenarios then? On the one hand, if the district judge had said, Mr. Carlos Powell, you have been continually filing these frivolous documents, and I've told you to stop and you haven't stopped, and that is the reason why I'm denying you the right to be pro se. That would be one thing, but the D.J. didn't do that. He didn't really specify what he meant exactly by delay, whether he meant delay the start of trial or whether he meant delay more broadly. And I'll make two points in response to Your Honor there. One is that when this court has used the term dilatory intent, it actually has intended it more broadly. And if you look at the quote from Cunningham, the court refers to, and this is a direct quote, any threat posed to the orderly progression and integrity of the trial by a defendant's dilatory intent. Now the court refers to dilatory intent here. There. There. There, I'm sorry. Dilatory intent there, which is essentially delay. The second point I'll make, the court there obviously interpreted dilatory intent more broadly than just delaying the start of trial. The second point I'll make is that if that is this court's concern, the remedy is not a remand for a new trial. The remedy is to ask the district court on remand what the court meant. This court only grants a new trial for a Sixth Amendment violation, not because the district court could have been clear. In other contexts, for instance, this court frequently remands for the district court to clarify what it meant. So if the court does view that as dispositive, that may be the best option here, is to remand for the district court to explain that further. I will note in the district court's defense, to the extent this court does view that explanation as insufficient, there was a lot going on at the time. There were a number of pretrial motions. There was preparation for trial, jury instructions. The district court simply would not have had time to expand upon the order in the way that the judge did. Now, getting back to where I started originally here, if the court looks at the Feretta hearing, the court will notice that from the outset of Carlos Powell's answers to the Benchbook Inquiry, Carlos Powell answered defiantly and only by referencing these protester theories. And it's important that he did that from the start of the Benchbook Colloquy, because if the court looks at page 2178 of the record, that's a couple of pages earlier, 2178 of the record, defense counsel notes that he had gone over the Benchbook Colloquy with Carlos Powell beforehand. So Carlos Powell knew which questions were coming. He knew which questions were coming, and the moment those questions were asked, he answered defiantly with protester theories. He said he didn't know what a criminal case was. In the very next sentence, when the judge tried to clarify, he says, with all due respect, I have heard that, and I haven't presented myself. And that's classic protester language, that you only are subject to the court's jurisdiction if you agree to it. So he's not even answering these questions directly. He says he doesn't understand that he's been indicted of drug charges. That just is not credible for somebody in his circumstance. So are there cases where this court or any other court has upheld a district judge denying a person the right of self-representation where it's clear that person is going to be a protester type of person? Yes. And I'll refer the court specifically to the Eighth Circuit's decision in Crewe. I submitted that last week in a 28-J letter. It is a recent decision where actually the facts supporting denial of self-representation are not even as strong as they are here because that request came several months before trial. Like Carlos Powell, the defendant there incorporated protester theories into his answers at the Feretta hearing, refused to answer the court directly, and like Carlos Powell, he appeared to request self-representation solely to present those theories. That's different than having those theories. The defense counsel is correct. If he just had those theories, that's not a basis to deny self-representation. But it's not just that he had those theories. It's that the district court had previewed how Carlos Powell would present those theories and most importantly, how Carlos Powell would react when the court tried to intervene to stop him. And that is the key point for the court, looking ahead at trial, knowing that you have a defendant who is going to be that defiant, regardless of what the court says. Assuming that there's no Sixth Circuit law on this, which seems like it's the Eighth Circuit that you're relying on. I think that's correct. You could hypothesize the answer being that if somebody wants to present a crazy theory as his defense, that under Feretta, he has the right to do that. Granted, the district judge during trial can say, I've heard you, you've presented your Moorish, whatever it is, theory, but now you must stop. And then, of course, if the fellow doesn't stop, then you can see the district judge making subsequent orders that limit the person. But to say that somebody can't have a theory, even if it's a crazy theory, and that's what he wants to do, I could see that somebody might not think that was the right way to go. I would disagree with you in part, Judge, and I think I'd disagree with you on a dispositive point. The disagreement here is not whether he wants to present a crazy theory. A pro se defendant can present the crazy theory. It still has to be an admissible theory. It still has to rely on admissible evidence. Criminal defendants, whether pro se or otherwise, do not get excused from complying with the rules of procedure or the rules of evidence. This type of theory here, in a drug case, is not admissible under any possible reading of the law. So the court knew that, right away, it would have to strike his argument, it would have to order the jury not to consider it, and that this would happen over and over again because of the way Carlos Powell had been acting beforehand. The argument is that presumably the judge had a reasonable basis to conclude that he would not, in fact, comply with the court's order if he represented himself. That is correct, Your Honor. He had been given quite the preview in the pretrial proceedings. Which would be at least arguably different if there was a colloquy, well, I want to say this, and the court says, well, you can say this, but you can't say that. Do you understand? Yes, I do. Then we might have more trouble. You might have more trouble, for instance, if the defendant had agreed not to present these theories. That might be a reason, and especially if the judge believed in them. Now, the judge is the evaluator of credibility. He has the power to judge credibility. Okay, go ahead. That's correct, Your Honor. Judge Moore, I would note that this might come out different, say, in a tax protester case where crazy theories are sometimes admissible evidence, for instance, of intent, what you relied on in good faith and not complying with the tax law. So it would depend on the circumstance of the case and whatever protester theory they're presenting would be admissible at trial if the district court needed to step in and strike it. The other fact I'll point to here is the timing. In addition to the answers, the timing, and we are not arguing that a motion made at the final pretrial conference is per se untimely, but the timing here was unusual. And more than unusual, it was suspicious. Because you don't just have a defendant who appears to authentically want to represent himself, does so consistently, does so clearly, does so in time for the district judge to react. In fact, you have a defendant doing so late in a two-year trial process who does so in coordination with his co-defendant when both of them are trying to fire their retained attorneys. There's no other evidence of coordination, but that would be very unusual for two defendants who have been represented by retained counsel for that long to suddenly at the final pretrial conference decide they want to fire their attorneys and state it on the record within pages of each other. So that in itself, I think, raised legitimate red flags for the district court, not least because they were retained attorneys. Now, the right to self-representation does not vary depending on whether someone is appointed or retained. But when someone gets to handpick their attorneys, the fact that they are trying to fire them that abruptly without any notice whatsoever is eyebrow-raising, and it does suggest an improper motive. The final point I'll make on this issue, I would ask the court to compare the way Mr. Powell acted here with the way Mr. Fleming, one of his co-defendants, acted. Mr. Fleming was allowed to represent himself at trial. He let the court know well in advance, and if the court compares Mr. Fleming's FREDA hearing with Mr. Powell's, and I'm referring specifically to page 10305 to page 10314 of the record, you'll notice that Mr. Fleming answered the court's questions directly. There were no protester theories. There was no suggestion of an improper motive, and the court permitted him to represent himself. So this is not a case of a judge reflexively prohibiting a defendant from representing himself. This was a judge who presided over a hearing where the defendant behaved improperly, had previous instances of the defendant behaving improperly in similar ways, actually had additional time to consider this because of the initial legal mistake and the government's motion for reconsideration, so pondered this question for quite some time and came to the conclusion that the defendant was trying to delay the trial proceedings. That is a purely factual finding. It cannot be clearly erroneous, and therefore the judge's decision here was not an abuse of discretion. I'm happy to answer any further questions on that issue, otherwise I will move with my remaining time to Ernest Probe's Sixth Amendment claim. The district court here did not abuse its discretion in denying Probe's request to replace his attorney at the final pretrial conference. All four of the factors that this court considers here support the government. Timing. Timing here is crucial, because if the defendant had made his request for a new retained attorney and actually showed that he was going to substitute a new retained attorney in well in advance of trial, the district court would not have had discretion to deny that motion. Does the record show when Probe found out that his lawyer was not prepared for trial? The record, I think, shows that it was quite recently before the final pretrial conference, but that's a misnomer and a misconception, Your Honor. Not prepared for trial, and they assume this was some deliberate choice by the attorneys not to prepare for trial to spite him. They were negotiating a plea agreement as he had instructed them to. He expected them to negotiate a plea agreement. That's how they expected the issue would resolve, and that's what they were doing. Now, of course, when those negotiations fell through, that is when Probe, and I think the record is pretty clear on that, that is when Probe decided to stop talking to them. Now, that lack of communication because he stopped talking to them did hinder their ability to prepare for trial. They're quite clear about that, that they hadn't been able to prepare for trial. That is not a basis for permitting last-minute substitution of counsel. A defendant cannot filibuster his case just because he doesn't like the government's plea offer, even if that does hinder the attorney's ability to prepare for trial. And the attorneys here notably did end up preparing for trial. The government made a record of that. If the court looks at page 2371 to 2372, the government explained that defense counsel had begun preparing for trial. The government explained that the defense counsel had been preparing? Yes, I understand that sounds weird. I'll explain. The government had physical evidence that the defense attorneys could come see. The government was also negotiating stipulations with the defense attorneys. So the government had at least some insight through its communications with defense counsel about what they were doing. One additional point I'll add. The defense counsel said on the record that they were not prepared. So what you're saying is troubling. It suggests that you believe the defense counsel were lying. But it's troubling even if that's not what you're saying. It's troubling in terms of what Progue would believe. He would believe that his counsel are not prepared if he believes them. Well, I don't know what Progue really believed, but the fact that he's not communicating with them suggests that to the extent they are having trouble preparing for trial, it falls on his shoulders. But then it can't stop talking to his attorneys just to push the proceedings down the road. And I will note that two more points on timing, both of which contradict defense counsel's argument here. That request for a continuance, yes, it was a compound question, but Progue answered it affirmatively that he did agree with the judge that a continuance would be necessary. He did not qualify it and only answer part of the judge's question. The judge actually found, based on Progue's answer, after seeing that answer and hearing that answer in person, that that's what Progue meant, relied on that fact in the judge's order. And Progue never challenged that, either in a motion for reconsideration or otherwise. Nor did Progue ever attempt to identify a retained counsel to replace his current attorneys. That's important for two reasons. One, he's trying to make this a replacement of retained counsel case. Well, that is only true if he's replacing retained counsel with retained counsel. If he, in fact, needs appointed counsel, he has no right to counsel of choice. The Supreme Court was clear in Gonzalez-Lopez. So we're back strictly to the good cause analysis. So was Progue detained in jail pending this trial? No, he was not, actually. It was how he fled. I knew that he did flee. So your theory would be he could have gone out and scoured the criminal bar and found the right person to represent him during this period. Not just could have, but had done so previously. If your honors look at the record, it took about six months for these counsel to make an appearance. And one other point I'll make about preparation for trial, your honor. These are two attorneys who have been involved in the case for a year and a half. Preparation for trial is a lot easier when you're that familiar with the case, when you've gone through discovery, when you've litigated pretrial motions, when you have evaluated your client's risk so that you can negotiate a plea agreement. In that context, the additional steps for preparation of trial are not that high for a defense attorney. It is identifying any potential witnesses your client might want to call, crafting opening and closing statements, and crafting outlines for cross-examination. That's really it. Now the one counsel supposedly had no familiarity with federal criminal proceedings. How was that counsel found? Obviously, we know that they were both retained. But is there anything in the record that would help me understand that? No, there isn't, your honor. I don't think it is in the record. But they were retained, and they were retained for about a year and a half. And they weren't like a partner and an associate or a twosome in a particular firm? No, they were actually, I think, independent. I do not believe they were affiliated. One additional point I will make here is that the defense counsel's argument is actually internally inconsistent. He is trying to say that a new attorney could have taken this on a month before trial, learned the entire case, including all the discovery, including all the pretrial motions that have been filed, including anything that the defense counsel had already spent a year and a half doing, and do that in a month, while simultaneously claiming that these attorneys, who knew the case far better and had this year and a half to learn the case, somehow couldn't. Counsel, a little bit ago you said you knew that there was some preparation being done because they had come and examined your files or something. Are you referring to just this whole pretrial period, or was some of this in the last month before trial? It was in the last month before trial, and the motion is clear about that. I see my red light is on if I can make one additional point about the timing of the court's consideration of this motion. The defense acts like the judge just arbitrarily kicked this down the road a couple of weeks after the final pretrial conference. That is simply not what happened. If the court looks at page 4203 of the record, you will see defense counsel actually asking to file a written motion outlining their reasons for withdrawal. It's very difficult to fault the district court for waiting for that motion when that is what the defense has asked the district court to do. It would be odd indeed for defense counsel now or for a court of appeals to decide that the judge was somehow abusing his discretion in doing so. Judge Guy, anything you'd like to ask? Thank you, no. Thank you, Your Honor. We'd ask that the conviction be affirmed. Thank you. What rebuttal times do we have? Madam Clerk? Two minutes. For who? Two minutes. Two, three, and two. Two, three, and two. Thank you. Go ahead, Mr. Drew. My friend suggests that when Judge Murphy said that the problem here was that Mr. Powell was trying to delay the trial, what he really meant was he was trying to prolong the trial, and at most we should give him a chance, you should give him a chance to explain himself, maybe take that suggestion up. Judge Murphy put his thinking on the record twice, and he ruled after the initial Ferretta inquiry, and then he ruled in writing in response to the government's motion for reconsideration of that first ruling, and the language, it seems to me, is pretty clear. He's talking about the case has been delayed. We now have a trial date. This man is just trying to delay it further. I don't think there's any real ambiguity there. The government suggests a host of possibilities. Possibilities. Well, this protester language was a clue. This was a clue. That was a clue. This is an awfully slender read, I think, to justify the denial of a fundamental constitutional right. In fact, what we have objectively is we have a respectful, responsive, complete and appropriate Ferretta colloquy. We have Mr. Powell agreeing specifically, even after the judge explained to him that these pleadings, these Moorish science stuff pleadings were improper, that he would understand he's bound by the same rules as anybody else, and he gets, quote, no special privileges. The cases to which the government, upon which the government realized this crude case, which was the subject of the 28J filing, involved a defendant who, quote, was persistently evasive and refused to directly answer the court's questions on two separate Ferretta inquiries. And that was the heart of the court's ruling. He also filed crazy documents. Well, as Judge Silverman wrote for this Ninth Circuit in the United States against Johnson, which is cited at page 10 and 11 of our reply brief, the behavior of the defendants during the trial of the case, while occasionally wacky, was not disruptive or defiant. The defendants filed numerous nonsensical pleadings, were uncooperative at times, and chose to wear their prison garb during trial. But they did not exhibit a blatant disregard for courtroom rules or protocol and did not make it impossible for the court to administer fair proceedings. The defendants' courtroom behavior, although eccentric at times, would not have justified, let alone required, the involuntary deprivation of their constitutional right to represent themselves. I know my red light is on. That was an example where they'd actually seen the trial. Yes. And Judge Boggs, you brought up Halder against Tibbs, and I was unmoored at the time. But if you look at the statement of facts in Halder, it was a train wreck. The defendants... Okay, we can judge that. Okay, all right. And that's not what we have here. Judge Guy, anything? No, sir. Okay, thank you. Thank you very much. Teresa? Judge, when we were talking with reference to the issue of a request that'll lead to evidence, and the wording in the warrants itself, it's what the warrant says, what it purports to authorize. And when it does, when it says lead to evidence, it opens up much more and goes beyond the scope of the Fourth Amendment. I might also point out in this regard that the summary provisions of the warrants read generally, there is probable cause to be that the requested information will lead to evidence regarding the crimes. So it's not only in the wording of the warrant. It's in the summary request of the applications. With respect to my argument regarding the pen register and the violation of that statute by using the stowaway or the cell phone simulator, I made an early reference to the Communications Assistance for Law Enforcement Act. And I would like to read a portion of that. That's at 470 U.S. Code Annotate 1001. It reads, with regard to information acquired solely pursuant to the authority for a pen register and trap and trace devices, call identifying information shall not include any information that may disclose the physical location of the subscriber. When they use this thing, they use it for the number, but they also use it to confirm the location of the cell phone and the location of the subscriber to the cell phone. And that's documented in the representations that the government made in its application for these warrants. Thank you, Counsel. Thank you.  Thank you, Your Honor. Recall the critical fact that distinguishes Prog's case from the previous cases and from the cases of his co-defendants. It was counsel, retained counsel, not Mr. Prog, who initiated the withdrawal and substitution process by telling Mr. Prog and then telling the court for the first time on March 25th and 26th of 2014 that as far as they were concerned, their retention in this case was limited to pretrial motions and plea negotiations and not for purposes of representing Mr. Prog's interests at the trial of this criminal matter. It's not as if they were prepared because Mr. Prog stopped communicating with them and they couldn't do their preparation. They were not prepared as they told the district court at page 9143 and 9145 and 46 of this record because they were not prepared or they were not retained to prepare. They were not retained to prepare and therefore, consequently, we did not prepare. Did Mr. Prog confirm that or have any documents of that sort? The inquiry was so inadequate, Your Honor, that he wasn't even asked. He wasn't even asked what's in the retainer agreement. He wasn't asked what did you sign. He wasn't asked what's your understanding of the retainer agreement. He wasn't asked how much did you pay him. He wasn't asked where would you get the money to find a new lawyer. He wasn't asked what have you already done to find a new lawyer. He was left alone because his attorney said we were retained to leave you alone. You're on your own. You're not with us. You're on your own if plea negotiations fall through. And because of counsel's position, this dispute about withdrawal, substitution, counsel of choice, appointment, good cause, burdens of proof, presumptions was inevitably bound to come before this district court because counsel, as far as they were concerned, were headed out of this case the moment the plea negotiations broke down. And that's just what happened. Anything else from anyone? Thank you. Mr. Carlson, we particularly want to thank you for taking this under the Criminal Justice Act. You don't have quite the white hair or non-hair of your co-counsel, but you've done a fine job as well and we appreciate your taking it under the Criminal Justice Act. That case will be submitted. The remaining cases will be submitted.